UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KARON L. BRAGG,

      Plaintiff,                      No. 06-CV-11226

vs.                            Hon. Gerald E. Rosen

ABN AMRO NORTH AMERICA, INC., and
HIGHMARK LIFE INSURANCE COMPANY,

      Defendants.
_____/

OPINION AND ORDER REGARDING
CROSS-MOTIONS FOR ENTRY OF JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     September 30, 2008     

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I. **INTRODUCTION**

      This denial of disability benefits case is presently before the Court on Cross-

Motions filed by Defendants ABN AMRO North America, Inc. and Highmark Life

Insurance Company, the insurer and administrator of ABN AMRO's Long-Term

Disability Benefits Plan, and Plaintiff Karon L. Bragg, requesting, respectively,

affirmance and reversal of the administrative decisions denying Ms. Bragg's claims for

short and long-term disability benefits. Having reviewed Plaintiff's and Defendants'

briefs, and the Administrative Record of this matter, the Court has determined that oral argument is not necessary. Therefore, pursuant to Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion sets forth the Courts's ruling.

## II. PERTINENT FACTS

Plaintiff Karon L. Bragg is a former employee of Defendant ABN AMRO North America ("ABN AMRO").[1] Ms. Bragg was employed by ABN AMRO and its predecessors for 23 years, from 1981 to April 15, 2004. For the first 13 years of her employment, from 1981 to 1994, Ms. Bragg worked as a savings counselor, bank teller and a loan underwriter. In 1994, she became a mortgage counselor, and in 1999 she was promoted to assistant manager/personal banker,[2] which is the most recent position Ms. Bragg held until she allegedly became disabled on April 16, 2004.

PLAINTIFF'S CLAIM FOR SHORT-TERM DISABILITY BENEFITS

On April 19, 2004, Ms. Bragg applied for short-term disability ("STD") benefits through ABN AMRO's employee benefit plan [*See* Plaintiff's Ex. 1]. ABN AMRO's STD plan is a self-insured, non-ERISA plan which provides disabled employees "salary

---

[1] Plaintiff was actually originally employed by Standard Federal Bank. Standard Federal was subsequently acquired by ABN AMRO. During the pendency of this action, ABN AMRO became LaSalle Bank Corporation. LaSalle Bank was subsequently acquired by Bank of America and officially adopted the Bank of America name on May 5, 2008.

[2] The Administrative Record ("AR") indicates that Ms. Bragg's job is a sedentary position which entails opening new accounts, answering phone calls, filing accounts, and faxing paperwork.[*See* AR 0050].

continuation benefits" to replace all or a portion of the employee's salary during the period of disability. *Id. See also* AR 0181.[3] The STD salary continuation benefits paid under the ABN AMRO plan equal 100% or 60% of the employee's salary for up to 26 weeks, depending on the employee's length of service.[4] *Id.*

Eligibility for benefits is delineated in the provisions of the STD plan:

> Proof of disability is required. The employer will be sent and is responsible for completing a medical release authorization. The employee's doctor will be required to provide medical documentation as it relates to the disability. During the disability period, continuation of benefits may be subject to a second opinion provided by a physician designated by Broadspire [the Company's short-term disability claim administrator.][5] The employee's doctor may also be required to provide additional medical documentation to substantiate the continued disability.

---

[3] 29 C.F.R. § 2510.3-1(b) provides, in pertinent part:

> (b) For purposes of Title I of this Act [ERISA] and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include --
>
> * * *
>
> (2) Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment).

[4] For an employee with 23 years of service like Karon Bragg, the STD plan allowed for payment of 100% salary for the first 20 weeks of disability and 60% of her salary for the 21st through 26th week. *See* Plaintiff's Ex. 1.

[5] Broadspire was originally named as a party-defendant in this action. However, by consent, on June 20, 2006, Broadspire was dismissed from this action. [Dkt. # 24; 35].

> If appropriate documentation is not provided within 10 business days from the date the disability begins, the Company reserves the right to discontinue an employee's pay until the documentation is furnished. It is ultimately the employee's responsibility to be sure that their [sic] doctor furnishes Broadspire with the required medical documentation (i.e., office notes, charts, x-rays, etc.) in a timely manner or short term disability benefits could be discontinued.

* * *

> To be eligible for STD Benefits, the disability must be deemed as such by the employee's physician and the disability management company.

[Plaintiff's Ex. 1.]

As noted, Broadspire Services, Inc. ("Broadspire") is ABN AMRO's STD claim administrator. Broadspire reviews the disability claims to determine whether an employee is entitled to the STD benefits. ABN AMRO's STD plan directs employees to contact Broadspire directly to make a claim for STD benefits. *Id.*

Ms. Bragg contacted Broadspire on April 19, 2004 claiming disability due to Post Polio Syndrome ("PPS")[6] and fatigue. *See* AR 0138.F-G. She informed the intake coordinator that her primary care physician, Dr. Peter Rodin, had prescribed Prozac and Welbutrin for her symptoms. AR 0138.H-I. She further advised that Dr. Rodin referred her to Dr. Charles Stern, a clinical psychologist whom she was scheduled to see on April 22, 2004. AR 0138.M.

On April 23, 2004, Broadspire's claim manager spoke with Ms. Bragg's primary

---

[6] Plaintiff was stricken with poliomyelitis when she was approximately 1 ½ years old. (She is now 57 years old.) The polio affected her right upper arm and shoulder.

care physician, Dr. Rodin, regarding her PPS and fatigue. Dr. Rodin stated that Plaintiff was off work because of psychological reasons, not physical reasons. AR 0144.

Broadspire thereafter contacted Dr. Stern and made several attempts to obtain clinical information from him concerning his treatment of Ms. Bragg. AR 0145. No objective clinical records, however, were ever provided. Therefore, on May 3, 2004, Broadspire advised Ms. Bragg in writing that her STD claim was denied. AR 0055. Broadspire's denial letter explained:

> Pursuant to ABN Amro's definition of a disability:
>
> "To be eligible for Short Term Disability, the disability must be deemed as such by the employee's physician and the disability management company. In order to receive short term disability benefits due to surgery and recuperation following surgery, there must be a medical necessity."
>
> I have received medical documentation from Dr. Rodin on 4/22/04 regarding post polio syndrome and fatigue. I spoke with his office on 4/23/04 and I was told you were out of work due to psychological and not physiological reasons. Dr. Stern was notified on 4/28/04 and 4/29/04, and to date we have not received any medical information from this provider. In order to perfect your claim for short term disability benefits, medical information, such as completed Gaf scores, functional deficits and/or results from psychological testing will need to be received and reviewed. Therefore, short term disability benefits are denied effective 4/16/04. . . .
>
> If you wish to have your claim reconsidered you must submit within sixty (60) days from your receipt of this letter:
>
> > 1) A letter of appeal to Broadspire
> >
> > 2) To support your disability you must include objective medical data such as:
> >
> > > a. Office notes
> > > b. X-Ray reports

AR 0055-56.

Plaintiff thereafter appealed and, in conjunction with her appeal, forwarded to

Broadspire additional records and information from Dr. Rodin and Dr. Stern, as well from

as a third, doctor, Dr. Daniel Ryan, a specialist in Physical Medicine and Rehabilitation,

whom Ms. Bragg first saw on June 3, 2004. All of this information, in turn, was

forwarded by Broadspire to two peer review physicians, Dr. Eddie Sassoon, a board-

certified physician specializing in physiatry (i.e., physical medicine and rehabilitation),

and Dr. Elana Mendelssohn, a board-certified independent peer reviewer specializing in

clinical and neuropsychology.

Dr. Sassoon noted that while Ms. Bragg complained of difficulty with sleep and

fatigue and reported symptoms which included depression, joint and muscle pain

weakness, and sensitivity to cold temperatures as well as increased irritability,

> [t]here is no evidence of significant loss of function to preclude [Ms. Bragg]
> from performing activities at the sedentary level. Updated documentation
> does not reveal any significant loss of range of motion or strength that is
> quantified. There is no evidence of updated diagnostic findings that reveal
> acute neurological impingement, spinal instability, muscle weakness or
> ligmentous disruption.

AR 0172.

> Dr. Mendelssohn reviewed Dr. Rodin's and Dr. Stern's records and found that

> From a psychological standpoint, the documentation indicates the presence
> of depression and anxiety. However, there is a lack of objective
> examination findings and behavioral observations describing a
> psychological condition impacting the claimant's functioning to a degree

that would preclude her from performing her occupation.

AR 0168-69.

After reviewing Plaintiff's job description, all of her medical records, including Dr. Rodin's notes, Dr. Stern's Behavioral Health Clinician Statement and a Psychological and Neuropsychological Assessment performed by him, Dr. Ryan's notes dated June 3, 2004, and the two peer reviews discussed above, on June 17, 2004, Broadspire upheld the original decision to deny her STD claim explaining:

> Your claim history confirms your first day out of work was 4/16/04. The presented medical documentation indicates you have a history of post polio syndrome, reactive depression and TMJ. It is noted you were initially diagnosed with polio at approximately 1 ½ years of age. Your symptoms have included decreased sleep, fatigue, depression, joint and muscle pain, weakness and sensitivity to cold temperatures, as well as increased irritability. You have been treated with Welbutrin for reactive depression and Prozac. For the TMJ, your dentist has prescribed a mouth guard.

> In a Medical Leave Request form completed by Dr. Rodin, he indicated you were unable to work due to post-polio syndrome with chronic fatigue. He also noted you were referred to a mental health provider. Verbally, your Case Manager was informed your disability was more psychological than physiological.

> Dr. Stern indicated the purpose of his evaluation on 4/22/04 was to assess your neurocognitive dysfunction and personality functioning. However, the evaluation submitted does not indicate any neuropsychological testing was performed. In the evaluation report, Dr. Stern summarizes your responses on the MMPI-2. He noted your responses were suggestive of depression, frustration and restlessness. You also reported social alienation and physical difficulties. Dr. Stern concluded you were depressed and the depression was either caused by or exacerbated by your physical symptoms. He recommended medical and psychological interventions. In a Behavioral Health Clinician Statement dated 4/29/04, Dr. Stern indicated you were able to complete the listed cognitive functioning items and perform activities of daily living such as cleaning your home, shopping, paying bills and driving

independently. Your reasoning and judgment were noted as within normal limits. He noted your psychomotor activity was slow, but there was no psychotic symptoms indicated. Dr. Stern noted you were only able to apply concentration for 5-10 minutes, which seems inconsistent with your reported abilities. While Dr. Stern indicated you experienced panic attacks, the symptoms, frequency and duration were not indicated.

While the above data indicates the presence of depression and anxiety, there is a lack of examination findings and behavioral observations to describe a psychological condition that would impact your functioning to a degree that would preclude you from work.

Dr. Ryan submitted documentation indicating you were unable to work due to post-polio syndrome. However, there were no recent diagnostic or physical examination findings submitted for appeal review. There was no evidence of findings that reveal acute neurologic impingement, spinal instability, muscle weakness or ligamentous disruption. In sum, there was no evidence of significant loss of function preventing you from performing sedentary level work.

Based on our review of the aforementioned data, we found there was a lack of medical evidence to support a significant impairment in functioning that would prevent you from performing your job duties as a Personal Banker II or any available ABN AMRO job for which you are qualified.

See AR 0060-62.

Ms. Bragg was also advised in this June 17, 2004 denial letter that she could request that Broadspire's determination be reconsidered but that she would have to supply additional data to support her claimed disability. *Id.*

Plaintiff did thereafter file a second appeal of the denial of her STD claim and included yet additional documentation which included Dr. Stern's psychotherapy notes, childhood medical records concerning her polio from her 1952-53 stay at Mary Free Bed Hospital, a letter from Dr. Rodin concerning Plaintiff's fatigue and weakness, and

additional medical documentation from Dr. Daniel Ryan.  With this second appeal, Plaintiff also requested copies of the STD and long-term disability ("LTD") policies and the summary plan descriptions for the plans.  [*See* Plaintiff's Ex. 9].

A second group of physicians thereafter reviewed Ms. Bragg's STD claim.  These included Dr. Robert Ennis, a orthopedic surgeon, and Dr. Lawrence Burnstein, a clinical psychologist.  Dr. Ennis noted the continued lack of diagnostic testing or other objective documentation to substantiate Plaintiff's claim:

> Additional documentation has been provided which includes Attending Physician Statement and letters.  A report from the claimant's physician dated 7/20/04 indicates that the claimant has neck pain and right arm weakness.  It notes that there was diminished range of motion in the cervical spine and tenderness and spasm in the cervical and shoulder region.  These findings are not quantified.  A followup from the claimant's treating physician Dr. Peter Rodin on 10/11/04 indicates that the claimant has had numerous complaints of fatigue and weakness that have waxed and waned.  <u>There is no documentation in Dr. Rodin's letter as to any physical examination or diagnostic testing and there are no objective findings as to range of motion, muscle strength, reflexes, sensory or motor power, absence of spasm or straight leg raising.  There is no documentation radiographically provided.  There is no electrodiagnostic testing provided.</u>
>
> Dr. Daniel Ryan, a physical medicine and rehabilitation specialist has provided a statement indicating that the claimant's diagnoses include weakness primarily in the right arm and generalized weakness related to previous polio.  It notes also that the claimant has neck pain which was myofascial or muscle related.  <u>There is no objective evidence provided by Dr. Ryan regarding this weakness and no quantification as to the range of motion, muscle strength, reflex testing, or any additional diagnostic, radiographic or electrodiagnostic testing.</u>
>
> Based on subjective complaints alone it is not possible to reach a determination that the claimant is unable to perform sedentary activities and employment at the present time.

AR 0195-96 (emphasis added).

Dr. Burnstein similarly found insufficient objective evidence to substantiate

Plaintiff's complaints. He observed that

> [T]he submitted documentation primarily relates to the claimant's physical
> condition. It is outside the scope of my practice to be able to determine the
> claimant's ability to perform work from a physical perspective. In regard to
> the claimant's psychological functioning, there are various notes and
> documents from her psychologist, Dr. Stern. However, <u>while Dr. Stern
> does express the opinion that the claimant would be unable to perform the
> core elements of her occupation, he does not substantiate this opinion
> through examination findings. Dr. Stern's opinion of the claimant's ability
> to perform the core elements of her occupation appear to be informed
> primarily by the claimant's subjective complaints and self-reports.
> Therefore, in the absence of examination findings documenting the
> presence of impairments, it cannot be substantiated that the claimant would
> have been psychologically incapable of performing the core elements of her
> occupation from 04/16/04 onward.</u>

AR 0202-03 (emphasis added).

After reviewing all of the medical information provided by Plaintiff during the

pendency of her claim and all four of the peer reviews concerning this matter, on January

12, 2005, Broadspire again upheld its original decision denying her STD benefits. In

relevant part, the January 12, 2005 denial letter sent to Ms. Bragg's attorney stated as

follows:

> Upon final level appeal, the issue is whether, due to depression, post-polio
> syndrome, or a combination of the two, Ms. Bragg has provided
> information that supports a determination that her symptoms are of such
> severity to prevent her from performing her job duties.

> To summarize briefly, Ms. Bragg suffers from post-polio syndrome ("PPS")
> and depression secondary to her PPS. Utilizing the information provided by
> you from the Social Security Administration, individuals afflicted with PPS

suffer from motor weakness, fatigue, sleep disorders, respiratory insufficiency during sleep, and mental disorders.

Ms. Bragg was employed by ABN-Amro as a Personal Banker. The position is classified as having a sedentary exertion level and is not considered a "high pressure job." . . .

Your letter of 12/17/04 argues that there was an unjustified reliance on the need to provide "objective" medical information, as that phrase is not contained in the Plan documents provided you. This position exalts form over substance. The pertinent provisions of the Plan state:

> *The employee's doctor will be required to provided medical documentation as it relates to disability. During the disability period, continuation of benefits may be subject to a second opinion provided by a physician designated by Broadspire. The employee's doctor may also be required to provide additional medical documentation to substantiate the continued disability. If appropriate documentation is not provided within 10 business days from the date the disability begins, the Company reserves the right to discontinue an employee's pay until the documentation is furnished. It is ultimately the employee's responsibility to be sure that their [sic] doctor furnishes Broadspire with the required medical documentation (i.e., office notes, charts, x-rays, etc.) in a timely manner or short term disability benefits could be discontinued.*

Moreover, according to the Policy Interpretation Ruling from the Social Security Administration, submitted by you on 12/22/04:

> *Sections 223(d)(3) and 1614(a)(e)(D) of the Act, and 20 CFR 404.1508 and 416.908, require that an impairment result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. The Act and regulations further require that an individual establish disability based on the existence of a medically determinable impairment; i.e., one that can be shown by medical evidence, consisting of symptoms, signs, and laboratory findings. **Disability may not be established on the basis of an***

***individual's statement of symptoms alone.*** *(emphasis added).*

The Policy Interpretation Ruling further states, *"[w]e generally will rely on documentation provided by the individual's treating physicians and psychologists (including a report of the medical history, physical examination, and available laboratory findings) to establish the presence of postpolio sequelae as a medically determinable impairment."*

The information provided on 12/22/04, reviewed in addition to information from Ms. Bragg's claim and 1st level appeal files, fail to meet either standard.

You provided a letter from Dr. Rodin dated 10/11/04, who indicates that Ms. Bragg has been followed by him on a regular basis since 1996. Dr. Rodin further reported that she has complained frequently as to fatigue and weakness, has been seen by several neurologists and has had several episodes of physical therapy. However, despite his long history with Ms. Bragg as a patient, there are no neurology reports and. . . minimal physical therapy notes. According to Dr. Rodin's letter, "[h]er fatigue is such that **she states** it is difficult to perform a regular 8-hour workday and this would be consistent with post-polio syndrome." (emphasis added.) Dr. Rodin's opinion, as well as any factual basis for it, is remarkably absent from your 12/22/04 submission.

The final issue is the information from Dr. Ryan. As part of your 12/22/04 submission, you included a thirty-five (35) page sworn statement/deposition from Dr. Ryan who, you report, is a noted specialist in the field of post-polio syndrome. . . .

In his sworn statement, Dr. Ryan stated that he examined Ms. Bragg in his clinic which included a history, examination and evaluation. . . . He also referred to an evaluation by a physical therapist and an occupational therapist. . . . His first examination was on 06/03/04 and he had most recently examined Ms. Bragg on 09/15/04. . . . Yet, the submission is devoid of Dr. Ryan's examination and evaluation results. Although Ms. Bragg was evaluated for therapy, and a therapy discharge summary was submitted, there are no therapy notes. While your submission contains ample documentation of Ms. Bragg's self-reported complaints, and of Dr. Ryan's opinion that Ms. Bragg is unable to work, despite the three (3) extensions of time to submit additional medical information, encompassing 160 days, there exists no charts, office notes, x-rays, etc., that would permit

an assessment of Ms. Bragg's inability to perform her job duties. . . .

In conclusion, the ABN Amro North America, Inc. Benefit Committee has determined there is a lack of medical evidence (i.e. abnormal laboratory or diagnostic imaging test results, detailed office notes, mental status examinations, etc.) to substantiate significant impairments in physical or psychological functioning that would have prevented Ms. Bragg from performing her job duties, or any other job at ABN-Amro for which she is qualified. Therefore, the original decision to deny Short Term Disability benefits, effective 04/16/04 has been upheld.

This review decision is final and therefore not subject to further administrative review.

AR 0106-110.

## PLAINTIFF'S CLAIM FOR LONG-TERM DISABILITY BENEFITS

While her STD final appeal was still pending, on December 17, 2004, Ms. Bragg filed a claim for long-term disability ("LTD") benefits. [*See* AR 0216-222] ABN-AMRO's LTD Plan is administered by Highmark Life Insurance Company ("HM Life"). *See* AR 0073-100. Broadspire served as the LTD claim administrator for HM Life, pursuant to an Administrative Services Agreement entered into between HM Life and Broadspire on October 17, 2003. [*See* Defendants' Combined Response, Ex. 4.]

Under ABN AMRO's LTD Plan, "disabled/disability" is defined as follows:

Disabled/Disability means our determination that a significant change in your physical or mental condition due to:

1. Accidental injury;
2. Sickness;
3. Mental Illness;
4. Substance Abuse; or
5. Pregnancy,

13

began on or after your Coverage Effective Date and prevents you from performing, during the Benefit Qualifying Period and the following 24 months, the Essential Functions of your Regular Occupation or of a Reasonable Employment Option extended to you by the Employer, and as a result you are unable to earn more than 60% of your Pre-disability Monthly Income.

After that, you must be so prevented from performing the Essential Functions of any Gainful Occupation that your training, education and experience would allow you to perform.

[AR 0077].

The ABN AMRO Plan further provides that HM Life has

full discretion and authority to manage the Group Policy, administer claims, and interpret all policy terms and conditions. This includes, but is not limited to, the right to:

1. Resolve all matters when a review has been requested;
2. Establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
3. Determine [an employee's] eligibility for coverage;
4. Determine whether proof of [the employee's] loss is satisfactory for receipt of benefit payments according to the terms and conditions of the Plan.

[AR 0091].

The same information submitted by Plaintiff in support of her STD claim was also submitted in support of her LTD claim, but the LTD claim was reviewed by a different division of Broadspire.

On February 7, 2005, Broadspire denied Plaintiff's LTD claim by letter informing her that the medical documentation she provided did not establish her inability to perform the duties of her own occupation. *See* AR 0137-0138.B.

On March 7, 2005, Ms. Bragg filed an LTD appeal and included, as new medical documentation, a report from Dr. Amer Aboukasm, a neurologist, who saw Ms. Bragg on January 27, 2005. [*See* AR 0344-46.]  Broadspire forwarded Plaintiff's entire file, including the record of her STD claim, to Dr. Barry Glassman, a board-certified independent peer review psychiatrist, and Dr. Michael Goldman, a physical medicine and rehabilitation specialist, for evaluation.

Dr. Glassman found that "the submitted documentation, while indicating that the claimant has symptoms of depression, fails to provide examination data that supports a functional impairment in the cognitive, behavioral or emotional spheres that would preclude this claimant from performing the core elements of her own occupation, from a psychiatric perspective."  *See* AR 0352-54.

Dr. Goldman, a board-certified specialist in physical medicine and rehabilitation, reviewed Ms. Bragg's file from a physiological perspective.  He noted that

> The findings of a post-polio syndrome generally require a direct documented relationship between the initial injury and the symptoms which occur many years later.  The reasonable medical link is generally imperative in order to be able to confirm that diagnosis and the link can occur as a result of further deterioration of the muscles or documented deterioration of the joints associated with the muscle dysfunction.  In the case of Ms. Bragg, she obviously did have polio, but in reviewing all of the medical records, it does not appear that there is any evidence that there has been any additional functional impairment regarding the proximal right upper extremity, than previously existed.

[*See* AR 0356-59.]

Dr. Goldman also specifically discussed his review of the report of Dr. Amer

15

Aboukasm, the neurologist to whom Ms. Bragg was referred by Dr. Rodin:

> One way to sometimes determine whether or not an acute process is ongoing is by electrodiagnostic studies and I did note that Dr. Aboukasin [sic] performed electrodiagnostic studies through the Michigan Neurology Institute on 01/28/05.  In his conclusions, he states that there is electrodiagnostic evidence of a severe and remote denervation in the right C5-C6-C7 myotomes with no evidence of ongoing active denervation.  This is consistent with the claimant's history of poliomyelitis affecting the right upper limb proximal muscles in early childhood, but being the fact that there is no ongoing active denervation, this confirms the poliomyelitis, but does not confirm a post-polio syndrome and in fact, it is much more likely that there is no post-polio syndrome occurring, at least in regards to the muscle function.  Also, it should be noted in Dr. Aboukasin's [sic] dictated report dated January 27, 2005, under physical examination he states that the claimant is not in any distress. . . .  Motor examination reveals that the cranial nerves II-XII are normal.  Motor examination revealed normal muscle tone. . . .  There was no significant deficit testing the supraspinatus or infraspinatus muscles on the right and all lower limb muscles were normal.  Sensory examination was normal.  There was no deficit to light touch or pinprick. . . .  Reflexes in the lower extremities were normal.  The claimant had normal station and gait and normal coordination. [Dr. Aboukasm's] impression was recent onset of right shoulder pain and some osteoarthritis pain in different joints raising a generalized suspicion of generalized osteoarthritis.

*Id.* at AR 0357.

Dr. Goldman also had a peer-to-peer consultation with Dr. Ryan on May 13, 2005.

According to Dr. Goldman,

> [Dr. Ryan] states that [Ms. Bragg] does not have normal function of her right upper extremity. . . .  He also reported that over the past year she has had an increase in pain involving the shoulder.  When asked if he was able to describe any functional impairment that she has other than the subjective complaints of pain and her relating that she has less function in the arm, he states that he really is not able to describe any other specific functional impairment.  We discussed the post-polio syndrome and there has been no significant change in the shoulder girdle symptoms from the time he initially saw her in June 2004 to the present time.

*Id.* at AR 0358.

In sum, Dr. Goldman concluded,

After having reviewed all of the current medical information and documentation, it is my opinion that there is not a functional impairment that would have prohibited the claimant from returning to her occupational activities from 04/16/04 through the present time. It appears that the claimant's current problems are not musculoskeletal as she has dealt with the same functional deficits for 50 years. In terms of the fatigue factor, this is subjective and I do not see any specific physical finding that would confirm a degree of fatigue to preclude her from carrying out her usual sedentary occupational activities. She is able to sit and move about as needed.

*Id.*

In accordance with the LTD Plan's procedure, Broadspire prepared a final level appeal summary for Plaintiff's LTD claim which was submitted to the LTD's plan administrator, HM Life. [*See* AR 0367-70] This summary included all of the medical information submitted by Ms. Bragg, as well as the six independent peer reviews conducted by Broadspire's physicians. *Id.*

HM Life then had Plaintiff's file reviewed by Dr. Marc Rice, a medical consultant with Industrial Medical Consultants. On June 28, 2005, Dr. Rice sent a letter to HM Life concurring with the findings of the six peer reviews. Specifically, Dr. Rice concluded that Plaintiff failed to provide objective documentation of a post-poliomyelitis syndrome and provided insufficient documentation to support a finding of clinical depression severe enough to impair the Plaintiff's cognitive, behavioral or emotional function precluding her from performing the duties of her regular employment. *See* AR 0362-65.

Based on the foregoing, HM Life concluded that there was insufficient

documentation to support a finding of disability, and that the claim administrator's

decision to deny Plaintiff's LTD claim would be upheld.  Plaintiff was informed of HM

Life's decision by a letter dated July 6, 2005 sent by  Broadspire to Plaintiff's counsel.

[*See* Plaintiff's Ex. 3].  This letter, written on Broadspire letterhead, stated, in relevant

part:

> Please be advised that Highmark Life Insurance Company has reached its
> final determination on your client's appeal.  Highmark Life Insurance
> Company's Appeal Committee has found that the submitted medical
> documentation lacked medical and psychological evidence (i.e. office notes
> documenting the presence of cognitive, emotional or behavioral
> impairments, evidence from an electodiagnostic study of ongoing active
> denervation, abnormal sensory examination, etc.) to substantiate significant
> impairments in functioning that would have prevented your client from
> performing the substantial and material duties of her own, sedentary,
> occupation.  Therefore, the original decision to deny LTD benefits,
> effective 10/13/04 is upheld.  Your client's employer has been notified of
> this determination.
>
> Feel free to contact our office with any questions. . . .
>
> Very truly yours,
>
>    /s/
> Susan Dorman
> On behalf of the Appeal Committee
> Integrated Disability Management
> Broadspire Services, Inc.

[Plaintiff's Ex. 3.]

Six months later, on January 5, 2006, Ms. Bragg sent a letter to Ms. Dorman at

Broadspire seeking to reopen her July 6, 2005 denial because she claimed to have new

medical evidence showing that she had PPS.  This new evidence was a second sworn statement given by Dr. Ryan on December 8, 2005.  [*See* Plaintiff's Ex. 6].  However, Broadspire's appeal coordinator informed Plaintiff on January 12, 2006 that she had exhausted all of her intra-Plan appeals and declined to reopen Plaintiff's claim, finding that this would be in conflict with the provisions of the LTD plan.  [*See* Plaintiff's Ex. 7.]

PLAINTIFF'S REQUEST FOR COPIES OF THE STD AND LTD POLICES

As indicated, on July 29, 2004, Ms. Bragg mailed ABN a certified letter requesting copies of the STD and LTD policies and the summary plan descriptions on July 29, 2004.  [*See* Plaintiff's Ex. 9.  Plaintiff received the STD policy and the LTD policy and summary plan description; however the LTD policy she received was not the document she requested because the document indicated that the insurer was Lumbermen's Mutual Casualty Company ("Lumbermen's"), and sometimes referred to "Kemper" as the LTD policy insurer,[7] not Highmark/HM Life.  Lumbermen's, however, was the insurer of the LTD policy prior to July 1, 2003; HM Life took over as the insurer of the LTD policy after July 1, 2003.  The terms and provisions of the Lumbermen's/Kemper LTD SPD and policy are in all respects *identical* to the terms and provisions of the HM Life SPD and policy. [*Compare* Plaintiff's Ex. 2 with AR 0073-0100].  According to Defendant ABN AMRO, there was a significant delay before the new copies of the LTD Plan documents were delivered to the Company, but Ms. Bragg eventually received the new LTD policy

_____

[7] Lumbermen's at one time owned Kemper.

documents showing HM Life as the insurer on the document on March 29, 2005.

Pursuant to Ms. Bragg's rights under ERISA, Plaintiff thereafter instituted this action for denial of disability benefits from the Defendants and failure to provide copies of the relevant ERISA plan policies as required by 29 U.S.C. § 1132(c)(1).

## III. DISCUSSION

### A.  STANDARD AND SCOPE OF REVIEW

This case presents both ERISA and non-ERISA claims.

### 1.  ERISA STANDARDS

The Supreme Court has ruled that the standard of review in ERISA cases is *de novo* unless the benefit plan gives the plan administrator discretion to determine eligibility for benefits or construe plan terms:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989).

*See also, Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 616 (6th Cir. 1998).

However, "where an ERISA plan expressly affords discretion to trustees to make benefit determinations, a court reviewing the plan administrator's actions should apply the arbitrary and capricious standard of review." *Williams v. International Paper Co.,* 227 F.3d 706, 711 (6th Cir. 2000).  Whether a plan provides its administrator or trustees with discretionary authority, however, does not depend upon the use of any specific

terminology or "magic words," (such as "construe," "interpret," "deference," or "discretion"), but the plan must contain "a clear grant of discretion." *Perez v. Aetna Life Ins. Co*., 150 F.3d 550, 555 (6 th Cir.1998) *(en banc)*.  Such a clear grant of discretion may be found where the plan provides that the insurer or plan administrator has the ability to require the claimant to furnish all required proofs, "written proof" or "satisfactory proof" of  a disability before continuing benefits is sufficient to give the insurance company discretion under *Firestone* to trigger the arbitrary and capricious standard. *Perez, supra*, 150 F.3d at 555; *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380-81 (6th Cir. 1996).  *See also*, *Patterson v. Caterpillar, Inc*., 70 F.3d 503, 505 (7th Cir. 1995) (finding grant of discretionary authority in plan language stating that "benefits will be payable only upon receipt by the Insurance Carrier or Company of. . .due proof. . .of such disability"); *Bollenbacher v. Helena Chem. Co*., 926 F. Supp. 781, 786 (N.D. Ind. 1996) (benefits paid "[w]hen the Company receives proof that the individual is disabled" held sufficient).

The arbitrary and capricious standard is a highly deferential one.  *See Killian v. Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 520 (6th Cir.1998) (quoting *Yeager v. Reliance Standard Life Ins. Co*., 88 F.3d 376, 380 (6th Cir.1996)) ("where, as here, the plan administrator is given the discretionary authority to determine eligibility for benefits or to construe the plan terms, 'we review the administrator's decision to deny benefits using 'the highly deferential arbitrary and capricious standard of review.'")  Under the arbitrary and capricious standard, a court will uphold a plan administrator's benefit

determination if that determination was rational in light of the plan's provisions. *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1987), *cert. denied*, 488 U.S. 826 (1988). *See also*, *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990) ("[W]hen it is possible to offer a reasoned explanation, based on evidence for a particular outcome, the outcome is not arbitrary and capricious.")

Although review pursuant to the arbitrary-or-capricious standard is thus extremely deferential, it "is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir.2003) (citations and internal quotation marks omitted). Application of the standard includes "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.*

By contrast, when conducting a *de novo* review in an ERISA denial-of-benefits case, the District Court must take a "fresh look" at the administrative record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Whether the standard is "arbitrary and capricious" or *de novo*, the Court is to conduct its review based "solely upon the administrative record," *id*, and generally, may not consider "evidence not presented to the plan administrator." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990).

2.  NON-ERISA STANDARDS

Non-ERISA claims are governed by state law principles. *See Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002); *Erie R.R. v. Tompkins*, 304 U.S. 64

(1938).  Under Michigan law, a clear and unambiguous insurance policy must be
enforced as written, using the plain and easily-understood meanings of the policy's terms.
*Gelman Sciences, Inc v. Fidelity & Casualty Co.*, 456 Mich. 305, 318; 572 N.W.2d 617,
*amended*, 456 Mich. 1230 (1998); *Royce v. Citizens Ins. Co*, 219 Mich. App. 537, 542;
557 N.W.2d 144 (1996). *See also DaimlerChrysler Corp v. G-Tech Professional Staffing,
Inc.*, 260 Mich. App. 183, 185; 678 N.W.2d 647 (2003) ("[I]f a contract is clear and
unambiguous, it must be enforced according to its terms."); *Vigil v. Badger Mut. Ins. Co.*,
363 Mich. 380, 383, 109 N.W.2d 793, 794 (1961) ("In the absence of ambiguity, the
rights of the parties rest on the contract as written.")

        Like the federal courts in ERISA actions, Michigan courts permit employers and
insurers to retain complete discretion to determine eligibility for disability benefits.  *See
Guiles v. University of Michigan Board of Regents*, 193 Mich. App. 39, 47 n. 4, 483
N.W.2d 637, 642 n. 4 (1992).  However, Michigan courts construe policy language
purporting to grant discretionary authority to insurers and claim administrators more
narrowly than the federal courts.  Specifically, the Michigan courts have rejected the
Sixth Circuit's determination in *Perez* that "satisfactory proof of loss"language is
sufficient to confer discretionary authority on claim administrators and trigger an
"arbitrary and capricious" standard of review. *Id.*

        In *Guiles v. University of Michigan Board of Regents*, *supra*, the Michigan Court
of Appeals reversed the trial court's grant of summary disposition in favor of the
defendant employer on the plaintiff's claim for long-term disability benefits under a non-

ERISA plan[8] which was based upon an application of the arbitrary and capricious

standard, finding an insufficient grant of discretionary authority in the employer's plan.

The *Guiles* court explained:

> Defendant submits that because the plan requires that a claimant submit
> "satisfactory proof" of total disability, the university reserved to itself
> complete discretion to determine eligibility. We find this argument
> disingenuous and accordingly reject it. Under *Firestone,* discretion is the
> exception, not the rule. *Anderson* [*v. Great West Life Assurance Co.*, 942
> F.2d 392,] 395 [(6th Cir. 1991)]. Where an employer wishes to retain
> discretion, it may do so but it must do so clearly. *Id.* In this case the
> language relied on by defendant does not clearly imply that the university
> shall have the last word on entitlement to benefits.

483 N.W.2d at 642 n. 4. *See also Krochmal v. Paul Revere Life Ins. Co.*, 474 Mich.1010

(2006) ("We VACATE the judgment of the Court of Appeals because we do not agree

that *Perez v. Aetna Life Insurance Company*, 150 F.3d 550 (C.A.6, 1998), to the extent

that the Court of Appeals relied on that decision, states the relevant Michigan common

law legal standard, and we AFFIRM the Wayne County Circuit Court's judgment of an

award of disability benefits.")[9]

In *Krochmal,* the Michigan Court of Appeals affirmed the Wayne County Circuit

Court's determination that the plaintiff was entitled to disability benefits under a non-

ERISA disability benefits policy and further affirmed the trial court's application of a *de*

---

[8] Because the plan at issue in *Guiles* was maintained by a government entity it was
not covered by ERISA. *See* 29 U.S.C. § 1002(32); 29 U.S.C. § 1003(b)(1).

[9] The Michigan Supreme Court's ruling is somewhat confusing because, as
discussed below, the Court of Appeals did *not* rely upon *Perez* in affirming the circuit
court's decision.

*novo* standard of review based upon *Guiles, supra.  See Krochmal v. Paul Revere Life Ins.

Co.*,  262 Mich. App. 115,684 N.W.2d 375 (2004).  The appellate court, however, stated

that it found *Perez* and *Yeager* persuasive and, but for the precedential nature of *Guiles*, it

would have found that the Paul Revere policy language requiring receipt of "satisfactory

proof of loss" triggered an arbitrary and capricious standard mandating reversal of the

circuit court's judgment:

> This language grants discretion to the plan administrator, just as did the
> pertinent language in *Perez* and *Yeager*.  We find those authorities
> persuasive.  We acknowledge that *Perez* and *Yeager* involved ERISA plan
> and that the instant case does not.  Nevertheless, the reasoning from these
> cases applies with equal force to the instant, non-ERISA policy.  As noted
> in *Perez, supra* at 556, "[t]he general principles of contract law dictate that
> we interpret the Plan's provisions according to their plain meaning, in an
> ordinary and popular sense."  We find no salient reason why the general
> principles of contract law should not also apply to the provisions of a non-
> ERISA plan.  *See Bianchi v. Automobile Club of Michigan*, 437 Mich. 65,
> 71 n.1, 467 N.W.2d 17 (1991) (setting forth the general rule that courts
> should construe contractual language according to its ordinary and plain
> meaning.)  The ordinary and plain meaning of the contract at issue indicates
> that defendant has discretion to determine whether plaintiff has submitted
> adequate proof of loss.  We conclude that the arbitrary and capricious
> standard of review should have applied to the evaluation of the claims
> adjustor's decision.
>
> However, in *Guiles, supra* at 47 n.4, 483 N.W.2d 637, this Court
> held, in evaluating a non-ERISA benefits plan, that the requirement of
> "satisfactory proof" of loss was insufficient to trigger the arbitrary and
> capricious standard of review. . . .
>
> We acknowledge that *Guiles* was decided before *Perez* and *Yeager*.
> Nevertheless, because it is a Court of Appeals decision addressing an issue
> of state law, we are bound to follow its holding.  *See* MCR 7.215(J)(1).
> Therefore, we must conclude that the trial court did not err in rejecting the
> arbitrary and capricious standard of review.  Instead, according to *Guiles,
> supra* at 43, 483 N.W.2d 637, a *de novo* standard of review applied.

684 N.W.2d at 385-86 (footnote omitted).

As noted in the foregoing authorities, where there is no "clear grant of discretion" in the policy a *de novo* review is required. Like federal ERISA law, Michigan law provides that under a *de novo* review, the Court gives no deference to the prior proceedings and views the case with fresh eyes. *See Dep't of Civil Rights ex rel Johnson v. Silver Dollar Café*, 441 Mich. 110, 115-116, 490 N.W.2d 337 (1992).

The Court will apply the foregoing authorities in deciding the parties' Cross-Motions in this case.

B.     PLAINTIFF'S CLAIM FOR STD BENEFITS IS SUBJECT TO *DE NOVO* REVIEW

As set forth above, ABN AMRO's STD plan is a non-ERISA plan. Therefore, Plaintiff's claim for benefits under the STD plan is governed by Michigan law. *See Cassidy v. Akzo Nobel Salt, Inc., supra*, 308 F.3d at 615; *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). As indicated, under Michigan law, a clear and unambiguous insurance policy must be enforced as written, using the plain and easily-understood meanings of the policy's terms. *Gelman Sciences, Inc v. Fidelity & Casualty Co.*, *supra*; *Royce v. Citizens Ins. Co.*, *supra*. Here, there is no argument of any ambiguity in the STD policy.

Defendant argues that the following STD plan provisions

(1)   "[t]o be eligible for short term disability, the disability must be deemed as such by the employee's physician <u>and</u> the disability management company (emphasis added)";

(2)   "continuation of benefits may be subject to a second opinion provided by a physician designated by Broadspire"; and

26

(3) "[i]f a short term disability claim is denied by Broadspire, ABN AMRO reserves the right to discontinue and recuperate any salary disability benefits that had been paid to the employee during the determination process. . ."

grant ABN AMRO discretionary authority to determine eligibility for benefits under Michigan law entitling Defendant to an "arbitrary and capricious" review of the STD claim administrator's decision in this case.

As set forth above, only a *clear* grant of discretion to the administrator will trigger an "arbitrary and capricious" standard of review under Michigan law. The Court finds that the provisions relied upon by Defendant -- whether taken separately or cumulatively -- do not pronounce an clear grant of discretionary authority to either ABN AMRO or its STD claim administrator, Broadspire. Therefore, a *de novo* review is required.

C. **PLAINTIFF'S CLAIM FOR LTD BENEFITS IS ALSO SUBJECT TO *DE NOVO* REVIEW**

Defendant ABN AMRO also argues that an "arbitrary and capricious" standard governs the Court's review of the administrative decision on Plaintiff's claim of LTD benefits as well.

As indicated above, Highmark Life Insurance Company (n/k/a "HM Life") is ABN AMRO's LTD benefits plan administrator. In relevant part, the Plan provides

> ***We reserve full discretion and authority to manage the Group Policy, administer claims, and interpret all policy terms and conditions. This includes***, but is not limited to:
> 1. Resolve all matters when a review has been requested;
> 2. Establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
> 3. ***Determine [an employee's] eligibility for coverage***;

4.     ***Determine whether proof of [the employee's] loss is satisfactory for receipt of benefit payments according to the terms and conditions of the Plan.***

[AR 0091 (emphasis added)].

The Cover Sheet of the LTD Plan states that "Highmark Life Insurance Company will be referred to in this Certificate as "we"," "our", or "us." [AR 0073].   There is, however, no mention of Broadspire Services in either the Cover Sheet or the Plan. Broadspire served as the LTD claim administrator for HM Life pursuant to a separate agreement entered into between HM Life and Broadspire -- to which Plaintiff's employer, ABN AMRO, was *not* a party.

This identical three-party relationship was presented to the court in *Crider v. Highmark Life Ins. Co.*, 458 F. Supp. 2d 487 (W.D. Mich. 2006).  In *Crider*, the plaintiff, a former employee of Wickes Lumber Company, had been paid long-term disability benefits pursuant to his employer's LTD benefits plan for four and one-half years.  The plan administrator was Defendant Highmark which had contracted with Broadspire Services for Broadspire to act as its third-party claims administrator.  Crider's benefits were terminated after Broadspire found that he was no longer entitled to benefits under the plan.  He subsequently brought an ERISA action in the District Court for the Western District of Michigan seeking reinstatement of his long-term disability benefits.

As in this case, Defendant Highmark argued in *Crider* that the court's review of the decision to terminate the plaintiff's long-term disability benefits should be reviewed under the "arbitrary and capricious" standard because the terms of the LTD policy

provided Highmark with discretion.  The language of the LTD policy in *Crider* is virtually identical to the language of the LTD plan at issue here.  In relevant part, the *Crider* policy provided:

> [W]e have the full and exclusive authority to administer claims and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.
>
> Our authority includes, but is not limited to, the following:
>
> 1.  The right to resolve all matters when a review has been requested.
>
> 2.  The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it.
>
> 3.  The right to determine (a) your eligibility for insurance, (b) your entitlement to benefits, and (c) the amount of the benefits payable to you.

458 F. Supp. 2d at 501.  Further, as in this case, the face page of the Group Policy defined "we," "us," and "our" as Highmark.  *Id.*

Although the *Crider* court noted that "[c]ourts have consistently interpreted this or substantially similar policy language as providing discretionary authority and have applied the 'arbitrary and capricious' standard to the administrator's decision," *id.*, it determined that Highmark was not entitled to the deferential standard in that case.  The court explained:

> If Highmark had actually made the decision to terminate plaintiff's benefits, Highmark would be entitled to this deferential standard of review. Here, however, Highmark delegated that decision to Broadspire Services, Inc.  The delegation was apparently unwritten and informal, as the record is devoid of any contract or other document establishing the authority of

Broadspire.[10]  The factual record points inescapably, however, to the
conclusion that Broadspire and not Highmark made the decision to
terminate plaintiff's benefits.  All of the investigatory work leading up to
the issuance of the October 19, 2004 termination letter was done by
Broadspire or its contractors.  The [termination] letter itself was on
Broadspire stationary and was signed by Shirley Heera, a Broadspire
disability claims specialist.  The record reflects no input, or even
knowledge, by Highmark predating the issuance of the termination letter.
The letter was not tentative nor was it made contingent on the approval of
Highmark.  The termination letter announced that benefits would cease two
weeks later.  Benefits ceased as of October 31, 2004, and were never
reinstated.  Broadspire clearly made the decision to terminate.

458 F. Supp. 2d at 501-02 (citations to the administrative record omitted and footnote

added).

Based on the foregoing, the *Crider* court found "as a fact that Broadspire, and not

defendant Highmark, terminated plaintiff's LTD benefits by letter dated October 19,

2004." *Id.* at 502.

The *Crider* court, however, observed that Highmark's delegation, in and of itself,

was not necessarily determinative on the issue of standard of review:

Highmark's mere delegation of decision-making authority, however, does

---

[10]  Highmark submitted a copy of its Services Agreement with Broadspire, under
which Highmark delegated to Broadspire "discretionary authority to render eligibility
determinations following the initial claim submission, as well as interpreting the terms of
the Plan. . .", as part of its Motion for Reconsideration.  The district court found
Highmark's submission to be both procedurally improper as the Service Agreement was
not included in the administrative record submitted pursuant to the court's scheduling
order, nor was it included with defendant's substantive brief, and lacking in substantive
merit because the delegation Highmark attempted to rely upon was not found in the Plan
or a summary plan description and the Service Agreement was not referred to, even
tangentially, in the Plan documents.  *See Crider v. Highmark*, W.D. Mich. No. 1:05-CV-
660 (10/16/06 Memorandum Opinion).

not in and of itself rob it of the benefits of the arbitrary and capricious standard. "[W]here a named fiduciary with discretionary authority 'properly designates another fiduciary,' then discretionary review 'applies to the designated ERISA fiduciary as well as to the named fiduciary.'" *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 Fed. Appx. 734, 742 (6th Cir. 2005) (quoting *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1283 (9th Cir. 1990). ERISA itself establishes the requirements for a proper delegation. 29 U.S.C. § 1105(c)(1) (plan may "expressly" provide for delegation). The terms of the plan are therefore the key to determining whether there has been a "proper designation. If the plan authorizes delegation by the fiduciary with discretionary authority, the delegation is proper and delegee receives the benefits of the deferential arbitrary and capricious standard. *Lee v. MBNA*, 136 Fed. Appx. at 742. If the plan does not authorize such delegation, only then does the court apply a *de novo* standard of review to the delegee's determination. *See Sanford v. Harvard Indus., Inc.*, 262 F.2d 590, 597 (6th Cir. 2001) (The *de novo* standard is "the standard of review applicable to a decision to revoke benefits when that decision is made by a body other than the one authorized by the procedures set forth in the benefits plan.") *see also Rubio v. Chock Full O' Nuts Corp.* 254 F. Supp. 2d 413, 423-25 (S.D.N.Y. 2003).

The Group Policy does not contain provisions authorizing Highmark's delegation of authority to Broadspire. In fact, the Policy is completely silent on the issue and contains no provision remotely satisfying ERISA's requirement of an "express" delegation.

*Id.*

The court also rejected Highmark's argument that a general provision of the policy, which empowered the insurance company to "establish rules and procedures for the administration of the Group Policy and any claim under it", is sufficient to authorize delegation:

Defendant's argument is foreclosed by the Sixth Circuit's decision in *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368 (6th Cir. 1994). In *Wulf*, the court decided that a plan provision giving the [benefits] committee power to "establish rules for the administration of the Plan" was insufficient to give the committee discretionary authority sufficient to invoke the arbitrary and

capricious standard.  By fair extension, such vague and general language cannot be deemed an "express" delegation of authority to a third party, when the concept of delegation is not even mentioned in the plan.

The Sixth Circuit's decision in *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 Fed. Appx. 734 (6th Cir. 2005), is instructive.  In *Lee,* plaintiff argued that review should be *de novo*, because of an improper delegation of decisionmaking authority.  The court began its analysis by affirming the principle that an ERISA fiduciary "may delegate its fiduciary responsibilities to another named fiduciary or a third party *if the plan establishes procedures for such delegation.*"  136 Fed. Appx. at 741 (emphasis added) (citing 29 U.S.C. § 1105(c)(1).  Turning to the Summary Plan Description (SPD), the court found a provision expressly allowing the plan administrator to delegate "discretionary authority" to claims administrators or other persons.  The court found this language sufficient to satisfy the requirements of 29 U.S.C. § 1105(c)(1).  "[W]hat is required is, if delegation is desired, that the instrument provide for the delegation procedures."  136 Fed. Appx. at 742.  The court therefore held that the delegation was proper and that the plan administrator did not forfeit the benefit of the arbitrary and capricious standard established elsewhere in the plan.  The court distinguished *Rubio v. Chock Full O' Nuts Corp.,* 254 F. Supp. 2d 413 (S.D.N.Y, 2003), on the ground that the plan in *Rubio* did not expressly allow for delegation.  136 Fed. Appx. at 742.

*Id.* at 503 (emphasis in original).

Based upon the foregoing authorities, the *Crider* court determined that "a proper delegation of authority under an ERISA plan [must] be express in the plan document; the consequence of an improper delegation is the loss of the benefit of the "arbitrary and capricious" standard for review of decisions made by an unauthorized delegate."  *Id.* Therefore, the court concluded that Broadspire's decision terminating the plaintiff's LTD benefits in *Crider* must be reviewed under a *de novo* standard.  *Id.*

The Court finds the *Crider* decision persuasive.  The LTD policies in *Crider* and this case are virtually identical and both cases involve Defendant Highmark and its

delegatee, Broadspire. As in *Crider*, here it was Broadspire, not Highmark/HM Life that made the decision to deny Plaintiff Bragg's claim for LTD benefits. As in *Crider*, the only evidence of delegation of HM Life's discretionary authority is an agreement, entirely separate and apart from the LTD policy and SPD, which is not referenced anywhere in the Plan documents. Under these circumstances, HM Life is not entitled to the "arbitrary and capricious" standard. Therefore, the decision denying Plaintiff's claim for LTD benefits will be reviewed *de novo*.

D.     UPON *DE NOVO* REVIEW, BROADSPIRE'S AND HM LIFE'S DETERMINATIONS DENYING PLAINTIFF'S CLAIMS FOR STD AND LTD BENEFITS ARE AFFIRMED

As indicated above, under the *de novo* review standard, the Court reviews the claim administrator's decision "without deference to the decision or any presumption of correctness." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). The court takes "a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins, supra* 150 F.3d at 616. The reviewing court "may consider both the quantity and quality of evidence before [the] plan administrator." *Smith v. Unum Life Ins. Co.*, 305 F.3d 789, 794 (8th Cir. 2002).

As set forth above, pursuant to ABN AMRO STD plan, to be eligible for STD benefits, it is not enough that Plaintiff's physicians deemed her to be disabled but also Broadspire had to find her to be disabled ("To be eligible for STD Benefits, the disability must be deemed as such by the employee's physician and the disability management

company.") , and to enable Broadspire to make this finding, "[p]roof of disability is required." [STD Plan, Plaintiff's Ex. 1.]  Plaintiff's doctors were required to provide "medical documentation as it relates to the disability. . . in a timely manner" and this required medical documentation was to include "office notes, charts, x-rays, etc." [*See* STD Plan, Plaintiff's Ex. 1.]

Under the LTD Plan, "disability" is defined as a "significant change in your physical or mental condition due to. . . accidental injury, sickness, [or] mental illness. . . that during the [180-day] Benefit Qualifying Period and the following 24 months prevents you from performing. . . the Essential Functions of your regular occupation.  After [this initial 30-month period], you must be so prevented from performing the Essential Functions of *any* Gainful Occupation. . . ." [AR 0077 (emphasis added)].  Like the requirements for STD benefits, an LTD claimant is required to provide satisfactory proof of inability to work due to sickness or injury. [AR 0083, 0091].

Broadspire determined that the evidence provided concerning Plaintiff's claim of disability failed to establish a significant loss of function to preclude Ms. Bragg from performing her sedentary job as a Personal Banker.  Plaintiff challenges this conclusion claiming that her doctors provided sufficient evidence that she is disabled from her job.

On *de novo* review of this issue, the Court is to take into account all of the medical evidence, giving each doctor's opinion weight in accordance with the supporting objective medical evidence supporting the doctors' opinions.  *Crider, supra*, 458 F. Supp. at 505.  In reviewing medical evidence in an ERISA case, the Court is not to apply the

"treating physician rule" and give more weight to the treating physician's opinion than that of non-treaters. *See Black & Decker Disability Plan*, 538 U.S. 822, 123 S.Ct. 1965 (2003). "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation. *Id.*, 538 U.S. at 834, 123 S.Ct. at 1972.

After reviewing all of the medical evidence in the administrative record of this case, the Court concludes that Broadspire's and HM Life's medical determinations were adequately supported.

In this case, the claim administrator denied Ms. Bragg's claims for benefits because she was unable to produce sufficient medical documentation to support her claim that she was disabled from performing the duties of her employment. This insufficiency was also found in the records she submitted for her appeal. In seeking reversal of the administrator's decision, Ms. Bragg relies on the records she submitted from her physicians and her past childhood medical records to support her claim to be eligible for disability benefits due to PPS. Ms. Bragg mainly relies the opinion of Dr. Ryan, who focuses his practice on individuals with polio and runs a clinic dealing with PPS. Dr. Ryan examined Plaintiff for her alleged disability three times -- on June 3, July 20, and September 15, 2004 -- and found that Plaintiff had weakness in her right arm and fatigue,

all related to Plaintiff's childhood history of polio, which he opined would affect her ability to work and to perform her daily living activities.

Broadspire conducted six peer reviews, and HM Life conducted an additional one, by board-certified specialist physicians to determine whether Ms. Bragg's medical evidence established her eligibility for disability benefits. All the physicians determined that Ms. Bragg was not eligible for disability benefits because her condition -- as established by the medical documentation submitted -- would not prevent her from performing her occupation. The Administrative Record indicates that Ms. Bragg's job description as a personal banker does not require physical labor which would preclude Ms. Bragg to perform the duties of her job [*See* AR 0050]. Ms. Bragg's job is a sedentary position where her typical day requires opening new accounts and answering phone calls. There is minimal physical labor required involved in retrieving new account packages for customers, filing accounts, and faxing paperwork. To be eligible for LTD benefits there must be a significant change in ones physical or mental condition which would prevent one from performing their duties. Thus, if there is insufficient evidence of a *significant* change in one's condition, or if notwithstanding the medical condition, one is able to perform the duties of his or her occupation, one is not considered disabled under the policies.

Moreover, the terms of the Plans require not only that the employee's physician must determine disability, but also the disability management company must also find the employee disabled to be eligible for benefits. Notably, Broadspire's peer review

36

physicians all found a significant lack of objective medical evidence supporting Plaintiff's claimed disabling condition. Dr. Sassoon noted that while Plaintiff complained of difficulty with sleep and fatigue and reported symptoms which included depression, joint and muscle weakness and sensitivity to cold, the medical documentation provided by Dr. Ryan "does not reveal any significant loss of range of motion or strength that is quantified. There is no evidence of updated diagnostic findings that reveal acute neurological impingement, spinal instability, muscle weakness or ligmentous disruption." [AR 0172].

A second peer review of the medical evidence supplied by Dr. Ryan and Dr. Rodin, Plaintiff's primary care physician, similarly found insufficient proof of disability. Dr. Robert Ennis, an orthopedic surgeon, noted that Dr. Rodin provided "no documentation. . . as to any physical examination or diagnostic testing and there are no objective findings as to range of motion, muscle strength, reflexes, sensory or motor power, absence of spasm or straight leg raising. There is no documentation radiographically provided. There is no electrodiagnostic testing provided." [AR 0195-96]. With respect to updated evidence from Dr. Ryan, Dr. Ennis noted, "There is no objective evidence provided by Dr. Ryan regarding [right arm] weakness and no quantification as to the range of motion, muscle strength, reflex testing, or any additional diagnostic, radiographic or electodiagnostic testing." *Id.*

A third peer review of Ms. Bragg's claimed disabling physical condition was done by Dr. Barry Glassman. Dr. Glassman reviewed Dr. Rodin's, Dr. Ryan's and, Plaintiff's

most recent doctor, Dr. Amer Aboukasm's opinions. Dr. Glassman, too, found insufficient evidence of any additional functional impairment regarding Plaintiff's upper right extremity so as to confirm a PPS diagnosis. *See* AR 0356-59.

Ms. Bragg's claim was also reviewed from a psychological perspective. Dr. Elana Mendelssohn, a neuropsychologist reviewed Dr. Rodin's and Dr. Stern's records and found "a lack of objective examination findings and behavioral observations describing a psychological condition impacting the claimant's functioning to a degree that would preclude her from performing her occupation." AR 0168-69.

Dr. Lawrence Burnstein, a clinical psychologist, also reviewed Ms. Bragg's psychological records and observed that Dr. Stern's opinion that Ms. Bragg was unable to perform the core elements of her occupation was not substantiated through examination findings. "Dr. Stern's opinion of the claimant's ability to perform the core elements of her occupation appear to be informed primarily by the claimant's subjective complaints and self-reports. . . . [I]n the absence of examination findings documenting the presence of [psychological] impairments, it cannot be substantiated that the claimant would have been psychologically incapable of performing the core elements of her occupation." AR -202-03.

A third review of Plaintiff's claim from a psychological perspective was also performed by Dr. Barry Glassman, a board-certified psychiatrist. Dr. Glassman also found a lack of substantiation in Plaintiff's medical records: "[T]he submitted documentation . . . fails to provide examination data that supports a functional impairment

38

in the cognitive, behavioral or emotional spheres that would preclude this claimant from performing the core elements of her own occupation." AR 0352-54.

These six reviews of Plaintiff's claim from a physiological and psychological perspective were subsequently confirmed by Dr. Marc Rice, an independent medical consultant. Dr. Rice, too, concluded that Plaintiff failed to provide objective documentation of PPS and provided insufficient documentation to support a finding of clinical depression severe enough to preclude Plaintiff from performing the duties of her job. AR 0362-65.

As the court in *Crider* observed, doctors' opinions, unsupported by objective medical findings, are not entitled to significant weight. *See Crider*, 458 F. Supp. 2d at 506; *see also Creech v. UNUM Life Ins. Co.*, 162 Fed. Appx. 445, 454 (6th Cir. 2006) (treater's failure to support his opinion with data or useful analysis sufficient to discount his opinion); *Lucy v. Macsteel Service Center Short-Term Disability Plan*, 107 Fed. Appx. 318, 321 (4th Cir. 2004) (a treating physician's conclusory statement that a patient is disabled is not entitled to deference in ERISA review).

Here, as the peer review physicians observed, there is a significant absence of objective medical documentation to support Plaintiff's physicians' opinions regarding her condition. Both the ABN AMRO Plans and the law require objective medical evidence to support a claim of disability. Such objective medical evidence is lacking here.

For the foregoing reasons, based upon *de novo* review of the medical evidence in the administrative record, the Court finds that Plaintiff has failed to establish that she is

not capable of performing the essential functions of her sedentary position as a Personal

Banker II.  Therefore, the administrator's decisions denying her claim for STD and LTD

benefits will be affirmed.

D.     PLAINTIFF IS NOT ENTITLED TO STATUTORY PENALTIES UNDER
       SECTION 502(c), 29 U.S.C. § 1132(c)(1), FOR DEFENDANTS FAILURE TO
       PROVIDE POLICY DOCUMENTS

ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1),  provides penalties for an

administrator's refusal to supply required information.  The provision states:

> Any administrator . . . who fails or refuses to comply with a request for any
> information which such administrator is required by this subchapter to furnish to a
> participant or beneficiary . . . by mailing the material requested to the last known
> address of the requesting participant or beneficiary within 30 days after such
> request may in the court's discretion be personally liable to such participant or
> beneficiary in the amount of up to $100.00 a day . . . .

"Under ERISA, the court is given discretion in determining whether a particular

remedy such as statutory penalties or other relief as it deems proper is an appropriate

remedy given the facts of a particular case."  *Montgomery vs. Metro. Life Ins. Co.*, 403 F.

Supp.2d 1261, 1262 (N.D.Ga. 2005).  Moreover, "[t]o properly plead an ERISA claim

against a plan administrator for breach of fiduciary duty to provide requested information

about the plan, the plaintiff must allege that the breach of fiduciary duty caused some

harm to him or her that can be remedied."  *Clark vs. Hewitt Assoc., LLC*, 294 F. Supp. 2d

946, 951 (N.D. Ill. 2003).

In determining whether a district court should assess a penalty under § 1132(c)(1),

courts consider such factors as "bad faith or intentional conduct on the part of the

administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." *Hennessey v. Federal Deposit Ins. Corp.*, 58 F.3d 908, 924 (3rd Cir. 1995), *cert. denied*, 116 S.Ct. 1318 (1996).

In the present case, Ms. Bragg claims she did not receive the STD summary plan description or the correct copy of the LTD policy. As an initial matter, to the extent Plaintiff seeks statutory penalties concerning the STD plan documents, as indicated above, the STD plan was <u>not</u> an ERISA plan. Therefore, Defendant was not required to maintain or provide a "summary plan description" for the plan, and no claim for statutory penalties under ERISA may be based upon the failure to provide an SPD for the Short-Term plan.

With respect to the company's provision of the incorrect copy of the LTD policy, as set forth above, Plaintiff was provided with a copy of the LTD policy and summary plan description which indicated that the insurer was Lumbermen's, not Highmark/HM Life. Lumberman's was ABN AMRO's LTD insurer prior to July 1, 2003; Highmark took over thereafter. Although the insurer's name on the Cover Sheet Certificate was changed as of July 1, 2003, in all other respects, the terms and provisions of the Lumbermen's LTD summary plan description and policy were identical to the HM Life SPD and policy. [*Compare* Plaintiff's Ex. 2 with AR 0073-0100.] Plaintiff received the correct copy of the SPD and policy as soon as copies became available on March 29, 2005, while Plaintiff's LTD claim was still under review by the administrator.

41

Given that the terms of the policy which Plaintiff received in July 2004 were *identical* to the terms of the policy under which Plaintiff was covered when she submitted her claim for LTD benefits, the Court finds that Ms. Bragg failed to prove she suffered and prejudice or sustained any harm as a result of not receiving the correct policy documents until March 2005.

Therefore, under the facts and circumstances of this case, the Court determines that Ms. Bragg is not entitled to statutory penalties under **§** 1132(c)(1).

## **CONCLUSION**

For all the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants Motion for Judgment on the

Administrative Record is GRANTED and Plaintiff's Motion to reverse the

Administrator's decision is DENIED.

IT IS FURTHER ORDERED that Plaintiff's claim for statutory penalties under

502(c)(1) of ERISA, 29 U.S.C. § 1132(c)(1) is DENIED.


s/Gerald E. Rosen
United States District Judge

Dated:  September 30, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager